**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL T.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 24 C 9092** |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **LELAND DUDEK,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, in May 2021, alleging he became disabled on May 28, 2021 (Administrative Record (R.) 189) due to "fused spine, knee surgeries, right knee dislocated, hernia." (R. 221). Over the next two and a half years, Plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on September 27, 2024, and the parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c) on October 8, 2024. [Dkt. #7]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

After an administrative hearing at which Plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; degenerative joint disease of the bilateral knees, status/post meniscectomies; bilateral carpal tunnel syndrome, status/post right release procedure; right cubital tunnel syndrome; and obesity. (R. 18). The ALJ found that the Plaintiff's other medically determinable impairments – hypertension, chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease (GERD), and left inguinal hernia repair – did not result in more than minimal functional limitations and were, therefore, non-severe. (R.18-19). The ALJ then determined that the Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, specifically considering Listings 1.15, 1.18, and 11.14. (R. 19-20).

The ALJ then determined that the Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> He would need to alternate from standing or walking every thirty minutes to sit for two to three minutes before returning to standing or walking; he could frequently handle and finger bilaterally; he could occasionally climb ramps and stairs; he could never climb ladders, ropes, or scaffolds; he could occasionally balance, stoop, and crouch; he could never kneel or crawl; he could never work at unprotected heights; and he could occasionally be exposed to vibration.

(R. 27). The ALJ summarized the Plaintiff's testimony and allegations and found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for

the reasons explained in this decision." (R. 21). The ALJ then reviewed the medical record noting that the Plaintiff's lumbar spine examinations had mostly been normal, and that he had benefitted from surgical treatment of his knees and upper extremities. (R. 22-24). The ALJ added that the plaintiff's activities of daily living – providing for his personal care; preparing his own meals; grocery shopping; doing light household chores; he exercising; and walking – indicated a greater level of functioning than the Plaintiff's subjective complaints of pain would suggest. (R. 24).

Next, the ALJ relied on the testimony of the vocational expert to find that, while the Plaintiff could not perform his past medium to heavy work as a delivery truck driver, he could perform other work that existed in significant numbers in the national economy. (R. 26-27). Examples of such jobs were: routing clerk (DOT 222.687-022; approximately 117,479 jobs available in the national economy); mail clerk (DOT 209.687-026; approximately 11,318 jobs available in the national economy); marker (DOT 209.587-034; approximately 136,788 jobs in the national economy. (R. 27). Accordingly, the ALJ concluded that the Plaintiff was not disabled and not entitled to benefits under the Act. (R. 36).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency fact finding." *Biestek v. Berryhill*, 587 U.S. 97 (2019). Under the "substantial evidence" standard a court looks to an existing administrative record and asks whether it contains "sufficient evidence to support the

agency's factual determinations." *Biestek,* 587 U.S. at 102. The "substantial evidence" standard is not a high hurdle to negotiate. It means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Biestek*, 587 U.S. at 103. *See also Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023).

Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility of witnesses. *See Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). *See also Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has had since Judge Posner's Panel Opinion in *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) an obligation to craft what Judge Posner called

4

an "accurate and logical bridge" between the evidence and the result ostensibly to afford the claimant meaningful judicial review of the administrative findings. *See also Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010).[2] *Sarchet* and its progeny required a reviewing court to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)("[m]ost importantly [the ALJ] must build an accurate and logical bridge from the evidence to his conclusion."); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Indeed, Judge Posner in *Sarchet* went so far as to say that "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." 78 F.3d at 307. *See also Jarnutowski*, 48 F.4th at 774 ("the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis.").[3]

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in the non-Social Security case, *Thompson v. Clifford*, 408 F.2d 154 (D.C. Cir. 1968), where he said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167.

[3] In coming to grips with the meaning of the "accurate and logical bridge" requirement, it should not be forgotten that, as Posner's oft-acknowledged hero, Oliver Wendell Holmes, warned, we must "think things not words...." *United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009).

It was Holmes who warned not against "the first use, but the tiresome repetition of inadequate catch words... – phrases which originally were contributions but which, by their very felicity, delay further analysis for fifty years" and which he concluded stemmed from "intellectual indolence or weakness – a slackening in the external pursuit of the more exact." *Law in Science and Science in Law*, 12 Harv.L.Rev. 443, 455 (1899). *See also Shapiro v. United States*, 335 U.S. 1, 50 (1997)(Frankfurter, J., dissenting). Thus, to conclude that the phrase in *Sarchet* was meant as a self-defining test or formula of easy and automatic
(continued...)

In recent years, however, this requirement has been described as "lax," *Crowell*, 72 F. 4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), and current authority has explained that "the 'logical bridge' language in our case law is descriptive but does not alter the applicable substantial-evidence standard. " *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021). *See also Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, Administrative Law Judges – and courts reviewing their decisions – might find a lack of predictability in their quest not only to fairly judge cases before them but to also write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle or a creek that can be easily crossed with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769 exemplifies this subjectivity. Two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning, while a third judge in dissent thought she had, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level.

---

[3](...continued)
application would seem to be inconsistent with Judge Posner's most deeply felt judicial impulses. *Cf., Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

*Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021). The result was similar in *Swiecichowski v. Dudek*, _F.4th_, 2025 WL 952961 (7th Cir. 2025), with two judges concluding the ALJ had not provided enough of a "logical bridge," and one – along with the magistrate judge, *Swiecichowski v. Kijakazi*, 2022 WL 2069251, at *6 (E.D. Wis. 2022) – being able to follow the ALJ's reasoning.

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus, consistent with the analysis of other courts generally, was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. Substance, not form, was what counted. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted," but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287 - 288 (7th Cir. 1985), the Court of Appeals explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Id.* at 287.

More recently, the Seventh Circuit again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022). *See*

7

*also Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The Court of Appeals has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). *Accord Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements' – an obligation that extends no further than grounding a decision in substantial evidence."). These pronouncements are consistent with those of the court a decade earlier where, for example, the Seventh Circuit emphasized that "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables [a reviewing court] to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Where all this leads us doctrinally we need not decide for it does not affect the outcome of the decision in this case. In this instance, given the objective evidence and plaintiff's significant, long standing treatment history, the ALJ did not do enough.

### III.

In this "logical bridge" case there is a gap between the ALJ's conclusions and the evidence on which those conclusions purport to rest. As just stated, sometimes a sketchy opinion will allow the reviewing court to follow how the ALJ got from the medical evidence to his or her RFC finding and conclusion that the plaintiff can still work. In some cases, medical records depict people who claim they cannot work even though they may be troubled by no more than a couple of mild impairments. Records like those allow a court to follow the reasoning of an ALJ who finds such an individual able to work on a daily basis and to follow the analysis without a lengthy explanation from the ALJ. In those cases, there is not much of a "bridge" needed to make it from one side to the other. This is not one of those cases.

It is often said that the district court is charged with reading the ALJ's decision as a whole and applying a common sense reading to the entirety of that decision. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). *See also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). But the insistence on a common sense, realistic assessment is no less applicable to the analysis required of an ALJ. Born on April 11, 1969 (R. 189), the Plaintiff was 52 years when he alleges he became disabled and 54 years old at the time of the ALJ's decision. That is what the Commissioner's regulations call "closely approaching advanced age." *Butler v. Kijakazi*, 4 F.4th 498, 502 (7th Cir. 2021). Before his alleged onset date, he had a stellar work record (R. 196-200), performing medium to heavy work delivering packages for UPS. (R. 222-223, 237-238). That many years of physical labor are not kind to the body. Not surprisingly, they left the plaintiff with back problems, knee problems, and wrist and hand problems. Back in 2006, he had to undergo a surgical fusion at L5-S1 in his lower back. (R. 813). Then came trouble with the plaintiff's knees. He had to undergo surgery to remove a torn meniscus from his left knee in February of 2016, and then had to undergo another surgery to remove a torn meniscus from his right knee in May of 2017. (R. 388).

In May 2021, x-rays of the plaintiff's left knee revealed medial joint space narrowing with essentially bone-on-bone changes, subchondral sclerosis/cystic changes, and degenerative changes patellofemoral joint. Right knee x-rays revealed medial joint space narrowing and degenerative changes patellofemoral joint. (R. 422). In August of 2021, an MRI of the plaintiff's lumbar spine revealed "quite a bit of facet arthropathy at L4-5 with right-sided foraminal stenosis at L4-5." (R. 408). At the same time, an MRI of the plaintiff's right knee showed degenerative changes, along with medial and lateral meniscal tears. (R. 400).

9

Things got worse. Along the way, plaintiff developed carpal tunnel syndrome in both wrists (R. 1366, 1457-59) and had to have surgery on his right wrist and thumb in January 2022. (R. 1221, 1316). He had to have another right knee surgery in March of 2022. (R. 1108-09, 1270-71). Plaintiff's back continued to deteriorate, and in November of 2022, an MRI of the claimant's lumbar spine revealed mild to moderate multilevel spondylosis, degenerative disc changes and disc bulging at multiple levels with an L3-L4 foraminal disc protrusion contacting the exiting left L3 nerve, lower lumbar facet arthropathy, and L4-L5 neuroforaminal stenosis. (R. 1113-14). Knee x-rays in April 2023 showed exacerbation of arthritis and degenerative changes in both knees. (R. 2232).

When the Plaintiff was not having surgeries, he was having injections to manage his pain. He had injections for his carpal tunnel syndrome in May 2021 (R. 1488, 1495) and in August 2021 (R. 1460). He had epidural steroid injections in his lower back in October 2021 (R. 1001-05, 1381, 1388) and in December 2022 (R. 1609-10). He has had injection after injection in his knees; in June 2015 (R. 1547), April 2016 (R. 1539), March 2017 (R. 1531), November 2021 (R. 1323), May 2021, September 2021 (R. 1414-16), June 2022 (R. 819), August 2022 (R. 1684-86), September 2022 (R. 844, 907), May 2023 (R. 1558). Relief from these procedures tends to be brief and seems to be getting briefer as time goes on. And so, in between injections, the plaintiff takes or has taken a number of medications, including hydrocodone-acetaminophen, celebrex, clonazepam, citalopram, omeprazole and ranitidine. (R. 801-02, 1225, 1235, 1246, 1259, 1375, 2229, 2203). To say the least, and by any standards, that is a lot of surgery, a lot of injections, and a lot of medicine! And, as the ALJ found, the plaintiff is also severely obese, which obviously has a detrimental effect on his knee and back issues as case after case after case has concluded obesity tends to do.

10

Yet, the ALJ felt that the plaintiff was exaggerating his pain. He arrived at this surprising conclusion by focusing on a few reports from 2022 and early 2023. (R. 23-24). For example, the ALJ said that, "[i]n early 2022, the claimant's back pain was noted as having significantly improved, he was noted as only needing naproxen intermittently, that he was moving around well, his neuromuscular examination was normal, and he had full strength in his lower extremities (Exhibit 5F, pg. 15)." (R. 23). Perhaps; but at that point the Plaintiff's knee pain had gotten so bad that he had surgery scheduled for the following month. (R. 459-60, 1108-09, 1270-71). That certainly does not sound like someone who can stand and walk for six hours out of every workday, day after day as the ALJ concluded he could.

The ALJ next pointed to a June 6, 2022 consultative examination where Plaintiff was said to have a "full range of motion of his lumbar spine; without muscle spasms; without tenderness; he did not need an assistive device; he had full strength in his lower extremities; and a straight leg raise test was negative. (Exhibit 12F, pgs. 5, 6)." (R. 23, 812-16). But, Plaintiff's knee pain was such that he would need a series of injections beginning later that month (R. 819) and continuing into August (R. 1684-86) and September (R. 844, 907). The ALJ said that an examination "in late 2022" revealed Plaintiff's back pain to be "only slight, as being intermittent, and as being well managed (Exhibit 17F, pg. 7)." But, actually, on October 18, 2022, Plaintiff reported increased back pain and right buttock pain, and his treating physician recommended and ordered an MRI. (R. 900-02). That study revealed a host of issues, including multiple disc protrusions and some nerve root impingement. (R. 1113-14).

The ALJ next pointed to an April 2022 exam where Plaintiff "was found walking with a normal gait, without tenderness, with his sensation intact, and with full strength (Exhibit 11F, pg.

11

14).” (R. 23). That was a follow up after right knee surgery. (R. 790). As we know, positive results from that procedure were short-lived. Plaintiff had to undergo a series of knee injections in June 2022 (R. 819), August 2022 (R. 1684-86), and September 2022 (R. 844, 907). Then an epidural injection for his back in December 2022 (R. 1609-10). That invasive treatment schedule does not leave much time for work and certainly does not confirm the ALJ's rather benign assessment of the Plaintiff's medical difficulties.

The ALJ next noted that "[e]xaminations into late 2022 continued to find the claimant without tenderness, without instability, with full strength, with normal range of motion, and with a normal gait (Exhibits 15F, pg. 18; 19F, pg. 17; and 25F, pgs. 7, 211)." (R. 23-24). The assessment in the report from August 18, 2022 (Exhibits 15F, pg. 18) says "exacerbation of right knee arthritis/degenerative changes . . . ." and another cortisone injection was performed. (R. 854). Another of the purportedly "late 2022" examinations was actually from January 18, 2022 (19F, pg. 17) and at that time Plaintiff reported only limited relief from his last cortisone injection and that his pain was 8/10, sharp and catching in nature. The pain was bad enough that he would undergo surgery a month later. Additionally, he was also scheduled for wrist surgery. (R. 1072-74). Another late 2022 report the ALJ cites – 25F, pgs. 7, 211 – is from May 18, 2023. (R. 1557-58). At that time, the assessment was "[e]xacerbation of left knee arthritis with bone-on-bone changes medially after injection series; and exacerbation of right knee arthritis/degenerative changes after surgery, limited relief with last injection series. The Plaintiff had yet another injection that day. (R. 1557-58). Yet another report the ALJ points to – 26F, pg. 487 – is from April 27, 2023 (R. 2231- 2232) and shows exacerbation of bilateral 6-7/10 knee pain and lumbar spine pain. X-rays showed medial joint space narrowing, particularly on the left side where there are bone-on-bone changes noted, calcification

about the joint, degenerative changes patellofemoral joint. Indications were that more injections would begin. (R. 2231- 2232).

It would be incorrect to contend that this constitutes merely nitpicking the ALJ's decision. It is certainly not intended to be that. Indeed, we could go on, but the picture should be clear. The reality is that even the evidence the ALJ cites to support allegations of pain undermine his reliance. In other words, the ALJ's "most minimal articulation," *Warnell*, 97 F.4th at 1053; *Morales*, 103 F.4th at 471, does not, to borrow from the legendary Vinny Gambini's phrasing, "hold water." On the contrary, the objective findings regarding the deterioration of the Plaintiff's back and knees tend to support his allegations of disabling pain. Plaintiff's endless quest for relief through multiple surgeries, multiple injections, and various levels of medication, including strong narcotics, also tends strongly to support those allegations. *See e.g., Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018)(criticizing the ALJ for failure to address fact that plaintiff's allegations of pain were consistent with the strong prescription pain medication he was taking); *Stark v. Colvin*, 813 F.3d 684, 687 (7th Cir. 2016)("The ALJ inexplicably failed to consider objective evidence that buttressed [plaintiff's] testimony of disabling pain. This evidence included . . . the nature of [plaintiff's] diagnoses . . . evidence of prescriptions for strong pain medications, epidural injections, multiple surgeries, and physical therapy."); *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013)(narcotic pain relievers, submission to steroid injections, and undergoing major surgery all serve to bolster the credibility of plaintiff's allegations); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)(finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain).

Just consider the Plaintiff's invasive procedure schedule from May of 2021 through May of 2023:

13

May 2021– knee injection

May 2021– hand injection

August 2021– hand injection

September 2021 – knee injection

October 2021 – back injection

November 2021 – knee injection

January 2022 – carpal tunnel surgery

March of 2022 – right knee surgery

June 2022 – knee injection

August 2022 – knee injection

September 2022 – knee injection

December 2022 – back injection

May 2023 – knee injection

In light of this extensive history of knee, hand and back and carpal tunnel pain and distress, it is not persuasive or palatable for the ALJ to have concluded that the Plaintiff was exaggerating his pain. Indeed, this consistent and extensive history of treatment for pain certainly, at the very least tends to confirm his allegations. That the ALJ seems to have thought otherwise constitutes having turned the proverbial blind eye to the record. Indeed, his surgery and injection schedule hardly leaves time for him to stand or walk for six hours five workdays a week. We might also add that, in addition to being dismissive of all that treatment, the ALJ also ignored the Plaintiff's work history. Work history may not be dispositive, but it does bolster credibility. *Prill v. Kijakazi*, 23 F.4th 738, 747 (7th Cir. 2022); *Stark*, 813 F.3d at 689. Especially here, given the other aforementioned evidence.

14

It is worth pointing out that all those injections were needed, not to manage Plaintiff's pain while he was working, but to manage the pain that resulted from what can only be described as a rather sedentary lifestyle. Unfortunately, the ALJ missed the mark on this as well. The ALJ said that:

> The [plaintiff's] activities of daily living also suggest a higher level of functioning than alleged by the [plaintiff]. Despite his alleged pain, the claimant provides his own personal care; he prepares his own meals; he goes grocery shopping; he can do light household chores; he exercises; and he walks (Exhibits 7E, pgs. 2, 4; 8E, pgs. 2, 3, 4; 12E, pgs. 2, 3, 4; 6F, pg. 20; 9F, pg. 5; and 12F, pg. 3). These activities indicate a greater level of functioning than the claimant's subjective complaints of pain would suggest.

(R. 24).

It is not clear where the ALJ came up with all that. The Plaintiff said he could prepare only sandwiches and frozen meals – "all easy stuff" – because he cannot stand long enough to prepare anything else. Standing or leaning exacerbates his pain. (R. 252, 261, 282). As for grocery shopping, he only goes once every two weeks. (R. 253, 262, 283). He does no housework or yardwork; his sons do all that for him. (R. 252, 261, 282). The farthest he can walk is two blocks or for about fifteen minutes. (R. 255, 264). He is no longer able to go to his grandsons' sporting events, go out to dinner, or go out and socialize. (R. 263, 284). He is no longer able to partake in his former hobbies like bicycling, fishing, or canoeing. (R. 254, 268). In short, only "literary perversity or jaundiced partisanship," Frankfurter, *Some Refections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 527-28 (1947), could support the ALJ's findings regarding the Plaintiff. In fact, the record depicts someone who has lost a large chunk of his life to pain and is largely incapacitated.

The Plaintiff's description of his activities provides a segue to another problem with the ALJ's decision. It is not just back pain, or just knee, pain, or just hand pain that plague the Plaintiff.

As the plaintiff put it:

> It seems that if I sit too long, I get sciatic pain. If I stand too long, my knees and back hurt. If I write or talk on the phone, my hands go numb and hurt. If I have to bend down and pick things up, it increases my sciatic pain. If I walk too far, my knees and back hurt.

(R. 250). In other words, if it is not one thing, it is another. And yet, the ALJ simply ignored the "combined effects of the [plaintiff's] impairments" even though an ALJ "[w]hen assessing if a [plaintiff] is disabled,... must account for the combined effects of the [plaintiff's] impairments, including those that are not themselves severe enough to support a disability claim." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); 42 U.S.C. § 423(d)(2)(B). A back with a fusion and a couple of bulging discs, plus two knees post-meniscus surgery that require shots on a regular basis plus obesity does not – without a substantial greater "logical bridge" that is missing on this record – allow for six hours of standing or walking every day. *See, e.g., Allensworth v. Colvin*, 814 F.3d 831, 833 (7th Cir. 2016)(ALJ failed to consider how plaintiff's obesity could aggravate his back, knee and OSA [obstructive sleep apnea] impairments); *Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014)(obesity and a painful, malfunctioning hip and knee); *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004)("A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time.").

The ALJ in this case improperly ticked off Plaintiff's impairments in isolation. (R. 22-23). That he did not really grapple with their combined effects as is required by basic Social Security regulations and all the judicial authorities interpreting them is clear from his discussion of the reports from 2022 and 2023. But here, as in all areas of life, context counts, as does common sense. *United States v. Montoya DeHernande*, 473 U.S. 531 542 (1985); *Vendetti v. Compass Environmental, Inc.*,

16

559 F.3d 731, 733 (7ᵗʰ Cir. 2009)(Posner, J.); *Vargas-Harrison v. Racine Unified School Dist.*., 272 F.3d 964, 971 (7th Cir. 2001).

When the ALJ was focusing on a normal back examination, the Plaintiff was getting ready for knee surgery. When the ALJ was focusing on a good knee examination, the Plaintiff was getting a shot in his hand. When the ALJ was focusing on a good hand examination, the Plaintiff was on his way to getting a lumbar spine epidural. Some might call that cherry-picking, some might call that not seeing the forest because of the trees; but either way it results in an inaccurate view of the evidence.

Accordingly, this case has to be remanded for another look and a far better "logical bridge" then the ALJ fashioned here – or perhaps it could be fashioned. It is perhaps worthwhile to note that the figurative elephant in the room has not gone unnoticed. As already noted, the Plaintiff was in the "closely approaching advanced age" category. He has no transferable skills. (R. 62). That means a finding that he could perform sedentary work – seemingly a more logical conclusion in this case – would mean that the Medical Vocational Guidelines would direct a conclusion of "disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 201.14; *Thomas v. Colvin*, 534 F. App'x 546, 549 (7th Cir. 2013). So, in this case, light work was the baseline if a finding of "not disabled" was to be made. It has to be said that the court tends to agree with the Plaintiff that the ALJ seemed to be bending over backwards a bit at the administrative hearing to avoid the sedentary category. At one point, the ALJ hypothesized a limitation to just four hours of standing per day. The vocational expert seemed to think that would not rule out any "light work," even though light work requires standing or walking, off and on, for six hours during an eight-hour workday, *see Greer v. Kijakazi*, 2023 WL 4540472, at *3 (7th Cir. 2023), saying "[i]t's still considered light work." (R. 60). That seemed to

17

catch the ALJ off guard, and rightfully so.  So, he sought some clarification:

> Q: I'm saying that, you know, generally, you know, light jobs, you know, they seem to be standing most of the day.  You know, typically, about six hours out of a day.  So, I'm just wondering on these particular jobs, you know, during those two hours or so that you're not on breaks or lunch, could the person sit then?

> A: It does not specify to the extent how many hours are sitting and standing.  It only specifies that it's light exertional level.  I don't have specific information, you know, as to the extent someone is allowed to – where those numbers are divided in terms of sitting and standing.

> Q: But based on your experience, are these jobs that would, you know, typically have, you know, at least short periods of time that the person could sit?

> A: There may be a short period of time in which the person can sit.

> Q: And with these jobs, based on your experience, they'll be available, you know, given that the individual could only stand and walk four hours out of an eight-hour workday?

> A: I would say for the mail clerk, there may be no ability to sit four hours.  They may be required more than four hours in terms of if they're standing and walking.  But – go ahead.

> Q: No.  Go ahead.

> A: But for the marker, I could not say specifically for the marker or the routing clerk.  Those are predominantly standing.

(R. 60-61).

The ALJ then moved away from the four-hour mark and asked whether those jobs would allow for standing or walking thirty minutes and then sitting for two or three minutes, over and over all day long. Surprisingly, given how equivocal her testimony had been as to the requirements of "light work" in general and the fact that she had been uncertain whether there would be short periods of time when a worker could sit – she could say only that "there may be" – she was quite confidant that there would be "an ability to alternate between sitting and standing for one to two minutes. (R.

18

62). So beyond the ALJ saying the quiet part – I have to avoid a sedentary RFC finding somehow – out loud, the vocational expert does not exactly fill one with confidence regarding how substantial her evidence is.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment, [Dkt. #13-1], is granted, and the ALJ's decision is remanded to the Commissioner.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/10/25

19